This morning is In re the Marriage of Thomas P. Scully. This is case number 4100330. For the appellant we have Jennifer Asher for the appellee Michael Costello. You may proceed. May it please the court, counsel, Mr. Scully. My name is Jennifer Asher and I represent the appellant respondent Cynthia Scully. To simplify, I will refer to Mr. Scully as Tom and Ms. Scully as Cindy, as that is how I refer to the parties in my briefs. The minor child at issue is Annabelle. We have appealed 10 separate issues. I will first focus on removal, reintroduction therapy, child support, distribution of the marital estate, and maintenance, but of course we'll address any issues that you may raise. The trial court's April 3, 2009 Memorandum of Opinion states that Cindy's request for removal is denied, as she failed to present evidence to meet the standards of Eckert and Kallenborn. That decision was against the manifest weight of the evidence, as the evidence presented at trial did meet those standards. The Supreme Court has stated that a decision for removal is not a simple bright-line test. It's a decision that must be made on a case-by-case basis. To look at the Eckert factors, we find the following. First, we look at will Annabelle's quality of life be enhanced. Cindy's position is that Hawaii is a place that is familiar and a place that Annabelle has grown to love. There are extracurricular activities that are available to Annabelle year-round. And similar to the rulings in Kallenborn, Annabelle will also receive benefits, as Cindy will directly benefit from a move to Hawaii. During the course of the litigation proceedings, Cindy's only job offer came from Tiffany's in Maui. Cindy married Tom and quit her job at the state of Illinois based on an agreement with Tom to raise a child. She had a $70,000 a year job. She had life insurance benefits, health insurance benefits, retirement benefits. She and Tom agreed that she would stay home and raise Annabelle. When she returned, she and Annabelle left in October of 2005 for Hawaii. When she returned in January of 2009, she found that the marital house was not a place that she and Annabelle could go back to live because it was being remodeled. Mr. Scully had filed a petition for dissolution of marriage and was residing at his parents' house. She had nowhere to go, stayed with friends, rented houses. She applied at numerous locations throughout the three-year course of the dissolution proceedings. The trial court recognized that with her two associate degrees, one in law enforcement and one in social work, she was looking at obtaining employment that would pay anywhere from $8.34 to $9.32 an hour, which would offset the cost of daycare for her. The other benefit of employment for Cindy in Hawaii is that Hawaii offers health insurance for employees who are part-time. So Cindy could work part-time and not have to pay for daycare the entire time and obtain health insurance benefits. Currently, the state of Illinois provides health insurance benefits for both Cindy and Annabelle. The next set of factors that we need to look at is motive. Why does Cindy want to move to Hawaii and why is Tom resisting the move to Hawaii? As I previously stated, Cindy wants to move to Hawaii to enhance Annabelle's quality of life. She has an increased support system. She was stationed there in the military years ago and she feels that's where her, not family, but friends and the support for she and Annabelle is located. One wonders why Tom disputes the move to Hawaii. Again, they left in October of 2005. In December, Tom was supposed to go to Hawaii to visit with Cindy and Annabelle. He never made that trip. Instead, he extended their trip in Hawaii and when Annabelle and Cindy came back, he filed a petition for dissolution. Again, he didn't offer that Annabelle could come and stay with his parents. He didn't provide a house for Annabelle. Cindy was forced to survive on credit cards until May of 2006 when the trial court finally ordered child support. Although Tom filed numerous pleadings requesting custody, requesting that a visitation schedule be set, none of those were ever called to hearing. Cindy sent email after email, telephone call after telephone call, had me direct letters to counsel, please can we do some kind of visitation, please can we do reattachment therapy, can we do a reintroduction therapy. Tom's visitation with Annabelle from October of 2005 was as follows. Two visits in March of 2006, once they met at a restaurant, another time they met at Chuck E. Cheese. After March of 2006, Cindy went to the marital residence on Father's Day to have Annabelle visit with her father. Tom refused to come to the car and refused to acknowledge Annabelle. In July of 2006, Tom sent an email saying, please don't have Annabelle call me anymore. 2007 comes around, he sees Annabelle one time at White Oaks Mall, and during that visit he wore a camcorder recording the whole visit. Never saw Annabelle in 2008. It wasn't until the eve of trial in 2009 that Tom started to express that he wanted to engage in reintroduction therapy. The only way that he would do it though was if it was in Sangamon County. So Cindy acquiesced, she wanted this to happen. They started the reintroduction therapy.  Tom missed one appointment and appeared 50 minutes late to the next reintroduction appointment. The trial court noted that he lacked common sense and an open-mindedness when it came to reintroduction therapy. And so the two final factors to deal with, how will the non-custodial parents' visitation rights be affected, and can a reasonable visitation schedule be established, also weigh in favor of Cindy. Tom has no set visitation schedule with his child. This has occurred since they left in October of 2005. He had in excess of three years to set up a visitation schedule. The Illinois Marriage and Dissolution of Marriage Act allows Cindy to make decisions regarding the upbringing of her child. She feels as though it's in her child's best interest to move to Hawaii. There's no visitation schedule in place that would prohibit her from moving, get the court to approve this. The trial court still denied that request. Finally, let's assume that Tom, three and a half years past, finally steps up to the plate, starts reintroduction therapy, is reattached to his daughter. Can a visitation schedule be set up? Sure it can. Tom traveled to Colorado to see his older child from a different marriage. Tom is a man of significant resources and, quite frankly, significant time as he doesn't work. A flight to Hawaii is long, but it's a flight that he can make. And as Annabelle gets older, it's a flight that she can also make to come home. Cindy testified at trial that she'd be willing to come home for visitations in the summer. This is not a custodial parent who's attempting to frustrate the visitation between a non-custodial parent and the minor child. This court has held that a custodial parent's right to move should not be subordinate to a non-custodial parent's right of visitation, especially times when the non-custodial parent doesn't exercise visitation. That's exactly what we have here. Now, this case is somewhat different in that Cindy doesn't have a job lined up. She's not moving because a new husband has a job that she needs to move to that state for. But still, the Illinois statute provides that Cindy has the right to decide her upbringing. Her one job offer came from Tiffany's in Maui. She has determined that it would be in Annabelle's best interest to move to Hawaii. The trial court erred in not permitting her to move. Next, we look at reintroduction therapy. The trial court also required that reintroduction therapy occurs in Sangamon County. Certainly, Cindy... Is this issue now? The reintroduction therapy is not... She's free to move within Illinois, but the reintroduction therapy, the way the judgment of dissolution reads, must still occur in Sangamon or Morgan County. So although she's moved on, it's Annabelle who has to travel. It's Annabelle who has to rearrange her dance lessons, her German lessons, her tennis, her swimming. She's now six years old. Those are things that have to get readjusted so that Annabelle and Tom can have reintroduction therapy. I think maybe Justice Turner's question went to whether or not counseling or the reintroduction therapy has been completed. The parties were doing reintroduction therapy in April of 2009. From April of 2009 until April of 2010, there was no more. It's recently started up again, and there's been four appointments from April of 2010 until current, which all have occurred in Sangamon County. I thought the trial court's order was that it would not last for more than 120 days. That is right, and it didn't occur within that time, so Cindy has agreed to continue on with reintroduction therapy. The judgment, the way the judgment's written, it says that reintroduction therapy has a separate paragraph from the time frame of 120 days. That's why we're asking for that paragraph to be removed. Certainly she has the ability to move within Illinois, but she still has to bring Annabelle back for reintroduction therapy here in Sangamon County. Similarly, the trial court, the way the judgment is written, denies Cindy's request to travel for extended periods with Annabelle. And again, the same arguments that I just made. If there's no visitation schedule, there's no reason that Cindy shouldn't be able to decide Annabelle's upbringing. If she determines it's in Annabelle's best interest to take extended weekends... It wasn't clear to me where she exactly was asking to travel to and for how long. She, Your Honor, was a regular traveler. She has friends in Oklahoma, Seattle, Hawaii, just various different locations that she's always traveled. And the minor child has always traveled since her birth. So no specific locations and no specific time frames. And I would argue that the prohibition leads to that very issue of vagueness. Can she go for an extended weekend? Can she take Annabelle out of school for a Monday and travel to St. Louis? The way the judgment is written, I believe that that is an error. So we are asking that the reintroduction therapy occur where Annabelle resides. And second, that the restriction that Cindy is not permitted to travel for extended periods with Annabelle be lifted. The next issue deals with respect to child support. The trial court deviated downward in its award of child support. This court has held that a deviation downward requires a specific finding for why the trial court deviated downward. We don't dispute the net income calculations of each year by the trial court. We feel those are right. However, it was an arbitrary decision for the trial court to utilize $3,500 per month in child support. And the argument is twofold. First is the trial court utilized the 2008 income, and I would argue that that was an error. The 2009 income, although projected, it's a farm year, the trial court acknowledged that there were farm leases that were signed. The trustee testified that these were set expenses, had the distributions that would be made to Tom down to the dollar. So the first error, I believe, was the utilization of the 2008 income versus the 2009 income. Especially in light, if you look at the increases of income that Tom has received from 2006 to 2007, 2007 to 2008, the biggest increases are seen from 2008 to 2009. So although the trial court deviated downward, I still... Are these cash leases or crop share? Cash leases. I believe the trial court simply said, how much is too much? The $3,500 bears no relation to Annabelle's monthly expenses. Cindy's monthly expenses at trial were established at approximately $4,300 per month, plus debt repayment of $1,000 per month. This court has held that oftentimes shown expenses are directly related to how much child support a person is receiving. Since May of 2006, Cindy only received $2,680 a month in child support. So since the initial child support calculation was done, her expenses exceeded... She and Annabelle's expenses exceeded the amount of child support ordered. Even if this court determines that the 2008 income was a proper amount to use, 20% of 2008 income results in a monthly child support award of $4,465. Instead, the trial court awards $3,500. That's a difference of $965 a month, or approximately $11,000 a year that the court has deviated downward. If you use the 2009 income, the court has ordered child support at less than 12% for Tom's minor child, Annabelle. In addition to deviating downward from the monthly income, the court in essence deviated downward when it denied Cindy's request for child support based on the income that Tom received as a result of his father's death. Michael Scully died in May of 2008. At the time of trial, the trustee was from United Community Bank, was the trustee for both Mr. Scully's two trusts that were the source of his income, as well as the trustee for Michael Scully's trust. She testified that Tom Scully only needed to sign an acknowledgement and he would receive $100,000. That specific request was subject to no tax. So 20% of that is $20,000. In addition to the $11,000 that the trial court deviated downward in the regular monthly support, in essence the trial court deviated downward $20,000 with respect to the specific request. Additionally, the trustee testified that Tom would receive $481,000 in September of 2009 when Michael Scully's estate was closed. Another $116,000 that the court deviated downward. The court's sole reasons for deviating downward were that it was a windfall and that Annabelle's educational expenses were paid as a result of her grandfather's trust. It was an error for the trial court to arbitrarily pick $3,500 a month when Cindy and Annabelle's expenses clearly exceed $3,500 a month. Cindy has no other source of income, which is a factor to consider when deviating downward. And the most important factor, I would argue, is the standard of living the child would have enjoyed had her parents not divorced. Her parents were together a short period of time during the course of their marriage before the separation. But in 2005, we know that Annabelle lived in a household where in excess of $132,000 were spent just on living expenses. She lived in a household where her parents routinely traveled to Hawaii, Seattle, Colorado, various trips together. She lived in a household where her father purchased a Mini Cooper for her mother. She lived on a house on the lake with her mother and her father. Her mom and her dad wanted to remodel the house or wanted to build a log cabin. They were just going to demolish the house and build a log cabin. When those plans fell through, her father spent $200,000 remodeling the house despite adding no value to the house. The appraisal didn't increase whatsoever. So if we look at Annabelle's standard of living, had her parents stayed together, she would reside in a house with her mom and dad with available income of $1.2 million in 2009. Instead, she resides in a household in 2009 that receives $42,000 in child support. I believe that was the biggest error that the trial court didn't apply the factor of what her standard of living would have been had her parents not divorced. Annabelle is, Mr. Tom Scully provides health insurance for Annabelle, but she still has her secondary insurance through the state of Illinois. So the state of Illinois pays for health insurance benefits for a child whose father receives income, doesn't work, but receives income from two trusts in excess of $1.2 million. The next error that the trial court made was the division of the marital estate. The trial court essentially took all of the marital assets, divided the assets on a 50-50 basis, and awarded all of the marital debt to Cindy. The trial court first erred in its valuation of the marital residence. A month before trial, the marital residence was valued at $170,000. During the party separation, Tom secured a loan in the amount of $124,000. So we have $170,000 minus $124,000, yet the trial court's valuation of this asset is negative $10,000. I'm not sure how the trial court reaches that valuation of that marital asset. Additionally, any property award given to Cindy, the $11,000 awarded to her, is required to be reported back to the bankruptcy trustee. I believe it's extremely important to realize when that credit card debt is... Doesn't that debt was discharged in bankruptcy? It's still in open bankruptcy because she filed subsequent to the petition for dissolution being filed. So it is not discharged. The trustee listed the stay, but Cindy's required to report back to the trustee what property distribution she's awarded in this proceeding. I wanted to ask you a question about the health insurance. Did you say that the court did not order the father to pay for the health insurance? He is ordered to maintain his health insurance coverage. However, he has a $10,000 deductible, and Cindy continues to have the state of Illinois provide health insurance for Annabelle given that deductible. Who has to satisfy the deductible? Did the order address that? The order did not. Subsequently, the trial court has ordered any uninsured expenses to be paid by Mr. Scully, but it was not addressed at the trial court level. The trial court's division of assets leaves my client in a position where she's left again with marital debt of $2,000 of a credit card. Looks like my time is up. Counsel, Mr. Costello has filed a motion to correct brief and argument. Have you received a copy of that? I have. Do you have any objection to it?  Motion to be granted. You'll have time in rebuttal. Counsel, Mr. Costello. May it please the court, Ms. Asher, Mr. Scully, this case has two issues, custody and money, as in all divorce cases probably. Addressing, search the record, it's not a major thing, but of accuracy, no temporary custody order was ever entered. Doesn't make any difference now. But that's my motion to correct the record. We said temporary custody was awarded. It wasn't. Child support wasn't. Michael Jordan, no harm, no foul. I will clear up one thing. Mr. Scully never, Tom never agreed that she would stay home. The court heard all the testimony. The trial court determined the credibility of the witnesses. As to Justice Turner's question about reattachment therapy, there is another proceeding pending. The court hasn't ruled yet in its finality. The respondent has filed a petition for various increases in the trial court. That's still pending. Hopefully it would have been finished and brought to your attention. It has not. But the court has ordered continuing reattachment therapy at the present time. There's a difficulty because the client lives, the respondent lives in southern Illinois, and due to the scheduling of the child, the reattachment therapy, the next visit is six weeks from now, or was six weeks as last scheduled. It's not proceeding with dispatch, but that's another issue. First issue the petitioner has raised is he should have custody of this child. Now, you will ask, well, he hasn't seen this child hardly at all, and I will agree with the counsel's characterization of the visitation. It all began, they were only together about 17 months. Tom wanted a child. They had a child. While she's in Maui, we get the email which precipitates the divorce. I would do something worse to you than kill you. That's what Cindy said to Tom. And what did she mean by that? She's going to take away the child. Totally destroy any interaction with Tom and the child. Now, Tom, when the child was born, for a short period of time they didn't travel. They were in the presence of other witnesses. Tom appeared to be a kind and loving parent when the child was very young,  From the divorce proceeding, he was fearful of being with the petitioner or the respondent and her friends. Now, one of the things that has been denied is that there was never any evidence of any break-ins in his home, which he had exclusive possession of, or anything else. The petition had to be filed and was granted where the personal records and all of the documents that he had from his first divorce was taken out of the house by Cindy. Petition requested their return, they were returned. She and her friends, from the evidence that was testified to, appeared to be coming into the home and placed him in great fear. He wanted unsupervised visitation with his child. She wouldn't grant it. There was a psychological examination of both parties. She found Tom, the psychological examiner, found Tom to be delightful. Although she said he had some difficulties focusing on Cindy, that would be natural sometimes. And he had impulse control, but that was not a concern. She recommended supervised visitation and reattachment therapy until he could get use to the child. She recommended custody to Cindy. There are cases, we've cited them, where if you deny interaction with the child, hinder any relationship, that it's grounds to award custody, ab initio, to the other side. And that's what we're asking for. Tom does not want to be in her presence or under her control, Cindy's, and wishes to have the child because he believes that he will be a better parent to the child. At the present time, the child is in every activity known to man. She takes French lessons. She takes all kinds of activities. She has no peer association. We have a stage mother here. What is the best interest of the child? We believe it's against the manifest way of the evidence to give that child to the mother under these circumstances. The next issue that Tom is cross appealing is the award of attorney's fees. Every time a petition was filed by the respondent, there was going to be attorney's fees paid. We suggest, though, that Tom has more income, Cindy has none at the present time except for child support, that the court should have ordered her to be in a position to show some need to pay all these attorney's fees. Mr. Scully has paid approximately $50,000 as attorney's fees to respondent's attorneys. And we never had a hearing, although requested, on need, but the ability to pay was shown by affidavits and by testimony, the trust and everything else. But we would suggest to the court that they consider lessening the amount of attorney's fees Tom has paid, and undoubtedly will incur in the future. Let's go to, those are the two issues of the petitioner. He's a better parent, though he hasn't been able to demonstrate it, and that the actions of Cindy in deliberately isolating the child from him warrant that the child go to be raised by Tom. Income. How much is enough? She gets $32,000 a year. She won't work. She won't take any job which would interfere, even if she took a job, that would interfere with the child's schedule. She hit the lottery when she married Tom Scully, for 17 months. $32,000 a year and she can't live on it. What kind of a lifestyle did you develop? The trial court said there's no evidence of any extravagant lifestyle during the marriage. None at all. Trips. And since, this is in this record, since the divorce, she's been to Maui, I believe, three times. Once for four months. She travels about. She made $70,000 a year prior to the marriage. Won't look for a job now. Won't help herself. No. Mr. Scully has to pay and that's why they're asking for an increase. The support she gets now is $32,000 a year for a child of five years of age. Now support is not to Cindy. The support is to the child. A five-year-old child can't make it on $32,000 a year. In addition, she gets, one of the trusts pays educational expenses. That was $27,000 a year. Since 2007 or 2006. An additional $27,000 for school, horseback riding lessons, French lessons, everything else. So we add that on top of the $32,000 a year. I mean, my goodness. How about the factor which says the court should consider the standard of living the child would have enjoyed had the marriage not been dissolved? Doesn't that work against you here? No, it does not, Justice, because $32,000 is more than adequate as to the standard they were enjoying. They didn't do anything except these trips. There wasn't any lavish parties or anything else. The child is getting the education, the child is getting the lessons, and it's a determination by, if you're a trillionaire, I mean, how much do you need? And we suggest that $32,000 is adequate. Especially when she won't go out and even look for a job or do anything except stay home with the child. What's the trial court's reason for deviating down from the 20% statutory amount? He said that $32,000 was enough and that it would be windfall to award more. And he relied on Bush and, of course, the other cases. They're both sides of the brief. She also received $50,000 in lump sum. Now, we have argued in our brief that by accepting a lump sum of $50,000 that she is precluded from asking for more maintenance. The cases that permit, or the basic tenor of the law is that if you accept the benefit of a judgment, you can't then appeal and ask for more or whatever. The cases that have allowed it have been where child support and maintenance have been combined in one factor and also in periodic maintenance, where if you accept periodic maintenance, then you're not precluded from increase. But we suggest, as lump sum maintenance is a piece of property, that you are precluded. You can't come in now and say I want more maintenance if you take the $50,000. He's paid up child support, he's paid the maintenance, he's paid the attorney's fees. And we suggest that upon a showing of $32,000 or even more, it's almost $40,000, that the child is receiving a lifestyle probably in excess of what they would have had together if the marriage were to continue. I'm not calling with the court at this point that $50,000, it appeared to me for 17 months of living together that could well be considered excessive, but we do now wish an increase and reopen the property. She's accepted the benefits and therefore is precluded. We wish court to rule on a lump sum property settlement. The respondent has always wished to go to Maui from get-go. I mean, it's obvious. She wants to live there, and we hear the great benefits of Maui. Well, the cost of living has never been produced in Maui by the respondent. The benefits of living in Illinois versus Maui, you can't suggest that you're not going to grow up without some benefits in Illinois, as we all have, rather than Maui. And the trial court said, I know, used a personal belief, I have some experience with Hawaii, and he said, he was talking about the cost of living. In a nutshell, the trial court was correct. She didn't produce any evidence of the factors that warrant petition for leave or removal to the state of Hawaii during the trial. Collinsworth and Eckert were not complied with. The court found that she didn't meet the burden of proving that she should be given leave to live in Hawaii. Again, we don't concern ourselves. If Tom is awarded custody, she can live anywhere she wants. We have no problem with that. The other factors that are raised, the ten points of appeal, basically deal with either removal or money, or we didn't get enough support. And that's the sum and substance of this case. He has demonstrated that he can be a good father with the little time he had before the filing of the complaint. The actions of Cindy have done nothing but put fear in him and the people she travels with. They broke into his home, they disabled his security cameras, put a mattress over the security camera, one of them, before they were disabled. Property has been missing from his home, his computer has been disabled. All this is off record. So where are we at with this case? Simply, is $32,000 to $40,000 a month child support adequate for the child? Not for the mother who won't work. There's testimony in this other case I can't get into about where they live and how they live. But Thomas has paid child support in a fair amount. We would suggest that even $32,000 for a five-year-old is excessive and might be lower. Because there's no showing of what lifestyle. Thomas Scully, there's no demonstration that he lives in a palace, that he does other things. His main occupation now is raising horses and agricultural pursuits, which he's trying to endeavor. And basically, his net for 2008 was $267,908. 20% of that is $53,000. But he's paying child support and maintenance to his other son, I believe, who's 16 years old. And he's paying maintenance to his first spouse who is ill and has cancer. For all these reasons, we would suggest that the attorney's fees be reduced, that he is already paid, that child support, if the court does not award custody to Mr. Scully, remain the same. But we suggest, in the best interest of the child, that Mr. Scully be awarded custody. Rebuttal, please. To both attorneys, did you speak to the clerk about 20-25-5 based on the cross-appeal? I did. Okay, so you have five minutes for rebuttal. And then if you need five, you'll have five to rebut the appellant's response to the cross-appeal. Thank you. Okay, rebuttal. Some Lottery run by Cindy. Cindy starts this marriage, a homeowner, $45,000 of equity in her home. She owns a motorcycle. She owns a truck. She owns jet skis. She's 40 years old. She works for the state of Illinois. She has great benefits. She marries Tom Scully. As stated by counsel, Tom Scully married her because he wanted a child. She agrees to have this child. She goes to a fertility doctor. They have this child. She stays home with the child. They decide to sign over the title of Cindy's residence to Tom to build a log cabin. That never happens. They start remodeling. Cindy and Annabelle leave for Hawaii. They come back. This is the lottery that Tom has placed Cindy at. She doesn't have a place to live. Tom hits the vehicle. The $36,000 in the joint account is drained. She has no means to live other than credit card indebtedness. So the time of dissolution, the court does not acknowledge the non-marital interest that she had in the residence at Lakeside Drive in Chatham. The court divides the assets 50-50 despite looking at the two non-marital estates. We have Cindy's non-marital estate prior to marriage is $30,000 approximately in her deferred comp plus her pension. At the time of trial, her deferred comp is down to $15,000 because she had to take money out to purchase a vehicle. Cindy's also left with the marital indebtedness of a credit card of $2,000 and owes her ex-husband money because he's the one who helped her make it through the long 3.5 years of trial. Tom's upset and counsel seems to suggest that somehow Cindy does nothing to support this child. That's akin to saying that a stay-at-home mother does not support or does not work to care for a child. Cindy is the sole parent who takes care of Annabelle. She's been the sole parent taking care of Annabelle since October of 2005. Certainly her employment opportunities are limited. She's dyslexic. She's worked the midnight shift throughout the course of her career. She describes herself as somewhat socially awkward. Yet the psychologist, Dr. Fry, describes Annabelle as a precious, well-groomed little girl. Cindy has, at over age 40, done everything to ensure that Tom and she's child is turning into a productive member of society. With respect to the standard of living that you raised, Justice Turner, with child support, I think that the Bush case and the Keon case are extremely different than the facts that we have here. First, Bush was a situation where we had two high-income producing parents. We had dad who was a doctor and the non-custodial parent and mom who was a physician and had remarried a physician. The trial court ordered that 20% of his income essentially got paid into a trust and $800 got held back for child support purposes. The appellate court reversed stating that was an improper calculation. It was never decided how much was a proper amount. In Keon, $8,500 was awarded for a minor child and it was awarded for a one-year-old. It was the non-custodial parent who argued that it was a windfall and the appellate court said, no, $8,500 isn't a windfall. We're looking at the child's shown needs. The trial court's award of $3,500 is against the manifest way to see evidence as there's no evidence to establish how that deviation downward was arrived at. With respect to maintenance, accepting the benefits, Cindy did accept the maintenance and gross payment. She needed to move on and start a new life with her Annabelle. Again, as I just stated, she was left with nothing. She had no home. Same goes to the standard of living. She has no extra money to travel with this child. She has no vehicle. She has things that she has to ensure that she and this child survive. We're asking for an increase in the maintenance and gross award. So accepting $50,000, we're not asking for periodic maintenance. We're asking that the maintenance and gross award be increased. We're asking that it be increased to $50,000 per year that she was married. She left a $70,000 a year job to have this child, and we believe it's fair for the award to be higher. Thank you. Mr. Costello, I'm not sure that counsel actually addressed your cross-appeal regarding custody and attorney fees. Counsel, do you have anything to say about that? Judge, I believe that the record speaks for itself with respect to attorney fees and custody. I'm happy to field any questions. All right. Well, Mr. Costello, you were promised an additional five minutes. You can proceed. Although I frankly don't see that there's anything to rebut based upon what counsel has argued. I only want to say one thing, three things. One, it's in the record that Mr. Scully set up a trust for Annabelle. Two, when they stole the records, and it's in this record, the child support is similar in the first case as to this case. And that was a marriage of some duration. And the courts heard all the arguments on numbers. I could go on and on and on. But one last point. The child was injured in the care of the petitioner. We were not given sufficient information. But the child is well now. We're concerned about the care of the respondent with the child. Okay. Thank you to both of you. The case is submitted and the court will stand in recess.